Jackie Williams, City Attorney City of Topeka City Hall 215 S.E. 7th Street, Room 353 Topeka, Kansas 66603-3914
Dear Mr. Williams:
You inquire whether the Board of County Commissioners for Shawnee County (Board) can utilize its home rule power[1] to exempt the county from the motor fuel tax apportionment statute[2] so that funds the legislature has allocated to cities in Shawnee County, including the City of Topeka, are diverted into the county coffers.
Counties have a dual role in government. They are agents of the state by virtue of their role in executing numerous state functions such as appraising real and personal property for tax purposes, registering motor vehicles, and ensuring that state election procedures are followed.[3] Counties, also, are providers of basic services to their residents. These services include maintaining county roads, providing law enforcement, ensuring growth through economic development, and attending to the health and recreation needs of residents.[4]
County Home Rule Authority
Recognizing the counties' role as local service provider, the legislature, in 1974, authorized counties to "exercise the powers of home rule to determine their local affairs and government authorized under the provisions of K.S.A. 19-101a."[5]
K.S.A. 19-101a(a) provides, in part:
 (a) The board of county commissioners may transact all county business and perform all powers of local legislation and administration it deems appropriate, subject only to the following limitations, restrictions or prohibitions . . .[6]
County home rule power is exercised by either an ordinary resolution or a charter resolution. Ordinary resolutions are used when the local legislation addressing county business does not conflict with state statutes or no statutory authority addresses the subject of the proposed local legislation.[7] A charter resolution is used when local legislation proposed under the authority of subsection (a) of K.S.A. 19-101a is contrary to an act of the legislature which does not apply uniformly to all counties.[8]
Charter resolutions exempt a county from all or part of non-uniform statutes and allow substitute provisions.
At issue here is the propriety of a charter resolution that exempts the county from K.S.A. 2009 Supp. 79-3425c(b). K.S.A. 79-3425c(b) provides, in part:
 (b) [A]ll payments [from the motor fuel funds in the special city and county highway fund] shall be made to the county treasurers of the respective counties, and upon receipt of the same:
 (1) The county treasurers of Sedgwick and Shawnee counties shall credit 50% of the money received to the road and bridge fund of such counties and apportion and pay the remainder of such moneys to the several cities located in such counties;
 (2) the county treasurer of Wyandotte county shall credit 10% of the moneys received to the road and bridge fund of such county and apportion and pay the remainder of such moneys to the several cities located in such counties;
 (4) the county treasurers of . . . all counties not listed in paragraphs (1), [or] (2) . . . shall credit all of the moneys received to the road and bridge fund of such counties.[9]
Pursuant to this statute, the Shawnee County Treasurer is directed to credit half of the money to Shawnee County's road and bridge fund and pay the other half to the cities within the county, which includes the City of Topeka.
The charter resolution at issue here asserts that K.S.A. 79-3425c
does not apply uniformly to all counties. The resolution then exempts the county from the above-referenced paragraph (b)(1) of the statute. The effect of the resolution is that the Shawnee County Treasurer credits all of the motor fuel tax payments to Shawnee County's road and bridge fund.
The first issue is determining whether altering the statutory motor fuel apportionment process is "county business." In order to do so, it is helpful to understand the motor fuel tax statutes.[10]
The Motor Fuel Tax and the Special City and County HighwayFund
The motor fuel tax law has been in existence since 1925.[11]
The law imposes a tax on motor-vehicle fuels that are used, sold or delivered in Kansas.[12] The purpose of the tax is to "[produce] revenue to be used by the state . . . to defray . . . the cost of construction, widening . . . reconstructing . . . maintaining, surfacing . . . and repairing the public highways" and to defray the expenses of the director of taxation in administering the act.[13]
The law is a comprehensive state program that requires licensure of distributors, manufacturers, importers, and retailers responsible for paying the tax, [14] periodic reports from licensees to the director of taxation, [15] and penalties for failure to pay taxes.[16] Money collected is remitted by the director of taxation to the state treasurer who then deposits the entire amount into the state treasury.[17] The state treasurer allocates the proceeds to several accounts, including the special city and county highway fund which fund is "to be apportioned and distributed in the manner provided in K.S.A. 79-3425c."[18]
K.S.A. 79-3425c — the statute from which the county exempted itself — requires the state treasurer to apportion part of the funds in the special city and county highway fund to the counties according to a formula set forth in the statute. With certain exceptions, payments are made to the county treasurers to the credit of the counties' road and bridge funds. The exceptions include the Shawnee County Treasurer who credits 50% to Shawnee County's road and bridge fund and pays the remainder to the cities within the county.
"County business" and "local legislation" for Purposes ofCounty Home Rule
In Von Ruden v. Miller, [19] the Kansas Supreme Court considered whether the state intangibles tax was "local legislation" or a statewide issue for purposes of determining whether the statute was authorized by Article 2, § 21 of the Kansas Constitution. Article 2, § 21 authorizes the legislature to confer only powers of "local legislation" upon political subdivisions.[20]
The intangible tax imposed a 3% tax upon earnings derived from ownership of money, notes, and evidences of debt.[21] The property owner was required to file a tax return with the state director of property valuation. The tax amount was certified by the secretary of revenue to the county clerk of the taxpayer's county of residence. The tax would then be collected and distributed by the county treasurer. Cities, townships, and counties were authorized to alter the tax amount or elect that no tax be levied.
The court noted that while cities enjoy constitutional home rule powers, [22] nothing in the constitution confers upon local governments the power to legislate statewide issues.[23]
Noting that the law had both statewide and local aspects, the court concluded that the intangibles tax was of statewide concern and not a local matter.
The intangible tax in Von Ruden and the motor fuel tax are similar in that they both create a structure whereby a state tax is imposed, collected, and distributed by county treasurers. Unlike the intangible tax statutes which applied uniformly to all cities and counties, the motor fuel statutes, arguably, do not apply uniformly to counties because the amount of money credited to a county's road and bridge fund varies depending upon the county. However, whether the motor fuel statutes are uniform or not is secondary to the primary issue of whether the county's legislation is "county business" as opposed to legislation that addresses statewide matters. In short, unless the legislation addresses "local affairs" (i.e. "county business"), it is irrelevant that a statute may not apply uniformly to all counties.
While the appellate courts have not addressed the issue of whether county legislation is local or statewide for purposes of county home rule, prior Attorneys General have done so.[24] In 1975, Attorney General Curt Schneider considered whether a county could exempt itself from a non-uniform statute creating the office of commissioner of elections.[25] The statute in question established the office of commissioner of elections in counties with a population exceeding 130,000.[26] The statute provided that the office would be headed by an election commissioner appointed by the Secretary of State and confirmed by the senate for a four-year term. The Shawnee County commissioners enacted a charter resolution exempting the county from the statute. The resolution provided, instead, that the election commissioner would be appointed by the county commissioners to serve at their pleasure.
Attorney General Schneider concluded that the county could not exercise its home rule power for two reasons. The first reason was because one of the statutory restrictions in K.S.A. 19-101a provided that counties were subject to all acts of the legislature concerning general elections and the election of county officers.[27]
The second reason — the rationale of which is applicable here — was that the appointment of an election commissioner is not a local matter because the office is created by state law to be filled by appointment by a state officer and subject to senate confirmation.
 Thus, it is not easily concluded that the filling of the office of election commissioner is a subject of merely local county legislative or administrative concern. Indeed, in our view, the contrary is true. Although the duties of the office do not extend beyond the territorial limits of the county and are substantially `local' in a territorial sense, the office itself, and the manner in which it is required to be filled by state law, compel the conclusion that the power to provide for the appointment of the holder of the office is not a local legislative matter.
Attorney General Robert Stephan issued two opinions in 1981 addressing a county's ability to address collection of property taxes. In Attorney General Opinion No. 81-111, a county inquired whether it could exempt itself from a statute[28] mandating that county attorneys, in counties having a population of less than 100,000, initiate proceedings to collect personal property tax judgments regardless of the vintage of the judgment. Instead, the county wanted to enact a charter resolution whereby an uncollected judgment would remain dormant after 5 years, at the discretion of the county attorney or board of county commissioners. General Stephan concluded that the establishment of a period of time beyond which efforts to collect delinquent personal property taxes are to cease is a matter which affects taxing districts other than the county. As such, a charter resolution would not be a matter of "county business" or "local legislation."
The second opinion involved Shawnee County's attempt to enact an ordinary resolution requiring all property owners to complete a county census report indicating the number of people residing at the property on December 1.[29] The report was to be returned to the county treasurer with the owner's real property tax payment. The resolution directed the county treasurer to refuse acceptance of payment of property taxes without the report. General Stephan concluded that because the county treasurer collects taxes on behalf of all taxing districts, the subject of property tax collection is not a matter of local legislation and administration pursuant to K.S.A. 19-101a.
Even before the advent of county home rule, the Kansas Supreme Court rebuffed an attempt by the Ellis County commission to enact a resolution withholding a percentage of ad valorem taxes levied by each taxing district in the county and collected by the county treasurer. The purpose of retaining this percentage was to address a projected deficit in the county coffers due to embezzlement of funds by the former county treasurer. While the court acknowledged that the county is statutorily required to attend to county affairs, it concluded that the county cannot, in the absence of statutory authority, withhold funds belonging to another taxing district.[30]
This rationale, as expressed in the Ellis County case and General Stephan's opinions applies here. Distribution of motor fuel taxes affects municipalities other than counties, and, therefore, is not "county business." Accordingly, Shawnee County cannot, under the rubric of home rule, appropriate funds that the legislature has directed be given to cities.
Statutory Duties of the County Treasurer
The motor fuel tax apportionment statute directs the county treasurer to distribute proceeds to both cities and counties.
The office of county treasurer is an office created by statute.[31] A county treasurer has both county and state duties imposed by law. County duties are prescribed in K.S.A. 19-501 etseq. They include receiving and disbursing money, maintaining accounts of receipts and expenditures, preparing financial reports, and collecting taxes.[32] A county treasurer's state duties are scattered throughout the statutes. These duties include processing motor vehicle registrations and certificates of title[33] as well as the collection and distribution of property taxes.[34]
In Weber v. Board of County Com'rs of MarshallCounty, [35] the Kansas Supreme Court rejected the county commission's attempt to exercise control over motor vehicle funds because the statute specifically provided that such funds are the domain of the county treasurer — not the county commission.
In Weber, the Court examined the role of the county commission and the county treasurer with respect to motor vehicle registration funds. Fees for motor vehicle registrations and certificate of title are paid to the county treasurer. The treasurer collects these fees on the state's behalf and processes the registrations and titles required by law. In exchange for these services, state law authorizes county treasurers to withhold a portion of the fees to offset expenses and pay compensation based upon a statutory formula.[36] These fees are placed in a special fund for use by the county treasurer. Any balance remaining in this special fund at the close of the calendar year is credited to the county general fund.
A dispute ensued when the county commissioners attempted to dictate the use of the motor vehicle funds by designating a portion of the funds as part of the county treasurer's salary for her county duties. The county treasurer objected to the commission's methodology arguing that the commission was using state motor vehicle funds to supplant county general funds.
The county commission argued that state law generally gives it exclusive domain over county finances, including exclusive control of county expenditures. The county treasurer argued successfully that, pursuant to K.S.A. 8-145(b), the special fund is to be used "for the use of the county treasurer in paying for necessary help and expenses incidental to the administration of duties in accordance with . . . the law."[37]
The Court concluded that K.S.A. 8-145 gives the commission no interest in the motor vehicle fund, except a contingent interest at the end of the calendar year, assuming any proceeds remained after the county treasurer fulfills her state responsibilities for motor vehicle registrations and titling.
This same rationale applies to the motor fuel proceeds. These funds, by statute, are paid to the county treasurers who then allocate the funds pursuant to K.S.A. 79-3425c(b)(1)-(4). Like the motor vehicle fund, county commissioners have no claim on motor fuel funds until the county treasurer credits the funds to the respective county road and bridge fund.
Sincerely,
 Steve Six Attorney General
 Michael J. Smith Assistant Attorney General
SS:MJS:ke
[1] K.S.A. 2009 Supp. 19-101a; K.S.A. 19-101b.
[2] K.S.A. 2009 Supp. 79-3425c.
[3] Osborne County v. City of Osborne, 104 Kan. 674 (1919);See Heim, Kansas County Government in Transition, Legislative Research Dept., 3 (Dec. 1976).
[4] Id. at 4-5.
[5] K.S.A. 19-101, fifth. Emphasis added.
[6] Emphasis added. Currently, there are 38 such limitations, restrictions and prohibitions.
[7] K.S.A. 2009 Supp. 19-101a(b).
[8] Id. K.S.A. 19-101b.
[9] Emphasis added.
[10] K.S.A. 79-3401 et seq.
[11] L. 1925, Ch. 274.
[12] K.S.A. 2009 Supp. 79-3408.
[13] K.S.A. 79-3402. "Public highways" includes all places open to the public for vehicular travel. K.S.A. 2009 Supp. 79-3401(o).
[14] K.S.A. 2009 Supp. 79-3403
[15] K.S.A. 2009 Supp. 79-3410.
[16] K.S.A. 2009 Supp. 79-3412; 79-3464e; K.S.A. 79-3413; 74-3419.
[17] K.S.A. 2009 Supp. 79-3425.
[18] Id.
[19] 231 Kan. 1 (1982).
[20] Cogswell v. Sherman County,238 Kan. 438, 440 (1985)("The constitution limits the power of legislation conferred to political subdivisions by the legislature to matters of local concern with which the local units of government could be expected to deal more effectively than the legislature.")
[21] K.S.A. 79-3109. Repealed L. 1982, Ch. 407, § 5.
[22] Kan. Const., Art. 12, § 5.
[23] Von Ruden, 231 Kan. at 11.
[24] See Attorney General Opinion Nos. 81-286(no home rule authority to require blood test as a condition of securing marriage license); 83-129(county home rule does not extend to dissolving a park and recreation district).
[25] Attorney General Opinion No. 75-66.
[26] K.S.A. 19-3419.
[27] L. 1974, Ch. 110, § 2.
[28] K.S.A. 79-2101.
[29] Attorney General Opinion No. 81-112.
[30] School District No. 2 v. Ellis County Comm'rs,138 Kan. 274 (1933).
[31] K.S.A. 19-501 et seq.; Weber v. Board of County Com'rs ofMarshall County, 289 Kan. 1166 (2009); School Dist. No. 12 ofOttawa County v. Board of Com'rs of Ottawa County,133 Kan. 528 (1931).
[32] Weber v. Board of County Com'rs of Marshall County,289 Kan. 1166, 1177 (2009).
[33] K.S.A. 8-143 et seq.
[34] K.S.A. 79-1801.
[35] 289 Kan. 1166 (2009).
[36] K.S.A. 2009 Supp. 8-145.
[37] Weber, 289 Kan. at 1178.